UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN MEDICAL RESPONSE OF MASSACHUSETTS, INC., <br><br> Plaintiff, <br><br> v. <br><br> INTERNATIONAL ASSOCIATION OF EMT's & PARAMEDICS, LOCAL 1, <br><br> Defendant. | CIVIL ACTION NO. 04-11736-PBS |

**PLAINTIFF'S STATEMENT OF
UNDISPUTED FACTS PURSUANT TO LR, D. MASS. 56.1**

Pursuant to LR, D. Mass. 56.1, plaintiff American Medical Response of Massachusetts, Inc. ("AMR") respectfully submits the following statement of material facts of record as to which AMR contends there are no genuine issues to be tried. For the Court's convenience, copies of the Complaint, Defendant's Answer (the "Answer"), the Award of the Arbitrator, dated May 13, 2004 (the "Award"), that the arbitrator, Michael W. Stutz (the "Arbitrator"), issued, and the Agreement between American Medical Response, Inc. and Local 1 International Association of EMT's & Paramedics NAGE, AFL-CIO, are attached as exhibits to Plaintiff's List of Evidence in Support of Plaintiff's Motion for Summary Judgment (the "List of Evidence") filed herewith. All record citations herein are to the documents attached as exhibits to the List of Evidence, and the letters in the record citations identify the tab in the List of Evidence where such evidence appears.

I. **The Parties.**

1. AMR is a corporation incorporated under the laws of the Commonwealth of Massachusetts. AMR does business in Massachusetts and has a principal place of business in Natick, Massachusetts. See Tab 1: Complaint at ¶4. AMR is a provider of ambulance services. See Tab 3: Award at 2.

2. Defendant International Association of EMT's & Paramedics, Local 1 (the "Union"), is an unincorporated labor organization. The Union is the authorized bargaining representative for certain employees, including paramedics that AMR employed in various locations in Massachusetts. See Tab 1: Complaint at ¶5; Tab 2: Answer at ¶5.

3. Matthew Levy ("Levy") began working for AMR in 1995 as an emergency medical technician and later was a paramedic for AMR. Levy became increasingly involved with the Union and in 1999 was appointed shop steward. In 2000, Levy was appointed as vice president of Region 5 of Local 1. In April 2001, Levy began to work full time for the Union as a national representative and continued to work for AMR on a *per diem* basis. See Tab 3: Award at 2-3.

II. **The Collective Bargaining Agreement.**

4. AMR and the Union were parties to a collective bargaining agreement that was effective from July 6, 2000 to July 5, 2003 (the "CBA"). The CBA provided for the arbitration of disputes. See Tab 3: Award at 2; Tab 4: CBA at Art. 16. A true and accurate copy of the CBA in effect at all relevant times is attached to the Complaint as Exhibit A. See Tab 1: Complaint at ¶6 and at Ex. A; Tab 2: Answer at ¶6.

5.  Article 15.1 of the CBA provides, "[t]he Employer shall neither discipline nor discharge any employee without just cause." See Tab 1: Complaint at ¶7; Tab 3: Award at 8; Tab 4: CBA at Art. 15.1. The CBA further provides in Article 15.2 that:

> The Employer and the Union recognize the concept of progressive discipline. The Employer shall follow progressive disciplinary procedures before discharging an employee. The Employer and the Union understand and agree that each individual case must be judged on its own merits. Serious or repeated offenses may call for discipline that is commensurate with the offense or total situation and not necessarily based on the premise of progression.

See Tab 1: Complaint at ¶7; Tab 3: Award at 8; Tab 4: CBA at Art. 15.2.

6.  The CBA in Article 19 provides in pertinent part:

> The Union and the Employer agree that sexual harassment is a form of misconduct which undermines the integrity of the employment relationship and cannot be tolerated in the workplace. Any conduct, whether committed by employees or Supervisory [sic] personnel, which falls within the definition of sexual harassment as defined in the Equal Employment Opportunity Commission standards is prohibited and will be investigated fully in accordance with the Sexual Harassment policy and procedure. Any employee found to have engaged in sexual harassment will be subject to discipline up to and including immediate termination.

See Tab 1: Complaint at ¶8; Tab 4: CBA at Art. 19.

### III.  **AMR'S policy against harassment.**

7.  The Arbitrator specifically found that AMR has a "broad" written company policy against sexual harassment. That "Policy of Non-Discrimination and Non-Harassment" provides, in pertinent part, that "AMR will not tolerate any form of unlawful harassment by or against any of our employees during working time in connection with business or work-related functions. Moreover, AMR will not tolerate harassment that is based on an employee's sex. . . ." See Tab 3: Award at 2 and 8.

8.  AMR's Policy of Non-Discrimination and Non-Harassment defines harassment as:

> conduct that has the purpose or effect of unreasonable [sic] interfering with an individual's work performance by creating an intimidating, hostile or offensive working environment. It can include verbal abuse or insults, demeaning jokes or innuendos, gestures or physical contact and display or circulation of demeaning pictures or materials. It includes conduct by anyone employed by AMR, affiliated with it or doing business with it, including clients.

See Tab 3:  Award at 8-9.

9.  More specifically, AMR's Policy of Non-Discrimination and Non-Harassment defines sexual harassment as:

> behavior directed at an individual on the basis of their gender, which is not welcome, is offensive, affects morale and as a result, interferes with the work effectiveness of the victim. Sexual harassment in the workplace is unlawful. Unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct will not be tolerated at AMR. In particular, sexual harassment includes any conduct when:
>
> - Submission to such conduct is made either explicitly or implicitly a term or condition of employment; or
>
> - Submission to or rejection of such conduct is used as the basis for employment decisions affecting an individual; or
>
> - Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

See Tab 3:  Award at 9.

10. AMR's Policy of Non-Discrimination and Non-Harassment also provides that "[i]f a supervisor or manager becomes aware of an incident of . . . harassment (whether or not the incident involves a person in particular [sic] person's area of responsibility or oversight), that must be reported to the Human Resources Department." See Tab 3:  Award at 2 and 9.

IV. **AMR previously disciplined Levy for an unlawful act of harassment.**

11. In April 2001, AMR disciplined Levy for harassment that he committed in March 2001. AMR, the Union and Levy entered into a Memorandum of Understanding, dated April 7, 2001 (the "MOU"), with regard to that harassment. At that time Levy received a seventeen-calendar day disciplinary suspension from AMR for violating AMR's Policy of Non-Discrimination and Non-Harassment. The MOU specifically provides that, "[i]n the event that the [sic] Matthew Levy repeats the above-mentioned offense, the employee will be terminated."[1] See Tab 3: Award at 3.

V. **The Arbitrator found that Levy committed sexual harassment on May 20, 2003, at an AMR sponsored EMS Night.**

12. AMR sponsored an industry event on May 20, 2003, a so-called "EMS Night." Many of AMR's employees attended EMS night along with Union representatives and representatives from emergency transport services across Massachusetts. See Tab 3: Award at 4.

13. At EMS Night Levy publicly spanked a female co-worker on the buttocks on two separate occasions, called her a "douche," subjected her to a stream of profanities, accused her of being "in bed with management" and of "fucking management," reduced her to tears, mortified her, and licked his hand as though to spank her yet a third time. See Tab 3: Award at 4-5.

14. More specifically, the Arbitrator found the following facts. David Banelli ("Banelli"), AMR's National Vice President of Labor Relations, saw Levy strike Alice Estremera ("Estremera"), a female co-worker, on the buttocks. Banelli described that

---

[1] The harassment that led to that discipline was not sexual in nature. Rather, Levy had engaged in acts of verbal harassment based on race/national origin.

- 5 -

slapping incident as "unprofessional and willful misconduct at a Company-sponsored event that violated the Company's discrimination and sexual harassment policy." See Tab 3: Award at 4.

15. Banelli immediately reported what he saw to Robert Zagami ("Zagami"), AMR's Vice President for Human Resources for the East Region, and told Zagami to investigate the matter. See Tab 3: Award at 4.

16. Estremera testified at the arbitration hearing that she and Levy had a close, personal, but non-sexual, relationship that included supporting each other emotionally after the death of a friend. At EMS Night Estremera was standing within view of various high-level management employees of AMR when Levy walked by and slapped her on the buttocks. After Levy slapped her, Banelli went to her and asked if she would report the matter to Zagami.[2] Levy later returned to Estremera a second time, at which point Estremera said to him, "Matt do you realize that you did that right in front of Dave Banelli?" Levy replied, "Fuck him. Since when are you in bed with management? When did you become a douche?" At that point, Levy *again* slapped Estremera on the buttocks. Estremera and Lorna Venere, a business development representative for AMR, both told Levy to knock it off and informed him that he was acting inappropriately. Levy later approached Estremera a third time and licked his hand as if he were going to spank her again. See Tab 3: Award at 3-5.

17. Venere gave the following account of events. Venere was speaking with Estremera when she witnessed Levy slap Estremera. Estremera "turned red and looked

---

[2] Estremera did not file a complaint with AMR but instead submitted a written report of the events at AMR's request. See Tab 3: Award at 4.

really embarrassed." Estremera started to cry after Levy asked her "since when are you 'fucking management?'" When Venere told Levy to "back off," Levy responded by stating, "Fuck management." See Tab 3: Award at 5.

18.  During the arbitration hearings, Levy admitted that he slapped Estremera's buttocks at EMS Night. Levy conceded that he regretted doing it "for the place that we were," although he described their relationship as one including two-way playful social pats on the derriere. See Tab 3: Award at 6.

19.  Levy also admitted that his conduct toward Estremera was *unwelcome by her* and that it has created tension in his relationship with her since that time. See Tab 3: Award at 6.

20.  Zagami's investigation of Levy's spanking Estremera twice at EMS Night led AMR to terminate Levy's employment for violating its policy against sexual harassment. See Tab 3: Award at 3 and 4. AMR discharged Levy effective May 30, 2003. See Tab: 1: Complaint at ¶10; Tab 2: Answer at ¶10.

### VI.    Despite finding that Levy sexually harassed Estremera, the Arbitrator ordered Levy reinstated with full benefits, including back pay.

21.  Following AMR's discharge of Levy from its employ, the Union filed a grievance and subsequently commenced an arbitration under the CBA. See Tab 1: Complaint at ¶11; Tab 2: Answer at ¶11.

22.  An arbitration hearing was held in Boston, Massachusetts, on March 4, 2004, before the Arbitrator. See Tab 1: Complaint at ¶13; Tab 2: Answer at 13; Tab 3: Award at 2. AMR and the Union were represented by counsel at the arbitration. See Tab 3: Award at 2. On May 13, 2004, the Arbitrator issued the Award. See Tab 1: Complaint at ¶14; Tab 2: Answer at ¶14; Tab 3: Award at 1.

23.     In the Award the Arbitrator found that Levy, by his conduct at EMS Night, violated AMR's Policy of Non-Discrimination and Non-Harassment. See Tab 3: Award at 11. The Arbitrator in the Award defined sexual harassment as "unwelcome, offensive sexual conduct." In accord with that definition, the Arbitrator found that Levy's conduct was "both unwelcome, Ms. Estremera said so, and offensive, although minimally so to Ms. Estremera." See Tab 3: Award at 10. In addition to finding that Levy's conduct on May 20, 2003 was both unwelcome and offensive, the Arbitrator recognized that Levy's offense "involves the public spanking of a woman." See Tab 3: Award at 12. The Arbitrator went so far as to conclude that Levy's "public spanking of a woman" "may be grounds for termination, and might even rise to the level of a *criminal assault and battery*." See Tab 3: Award at 12 (emphasis added).

24.     The Arbitrator found that Estremera was "mortified" that Levy expressed such physical intimacy with her in front of Banelli. See Tab 3: Award at 12.

25.     The Arbitrator further found that AMR has the right to prohibit public spankings by its employees, particularly at an event such as EMS Night. See Tab 3: Award at 13.

26.     Despite having (i) publicly spanked a female co-worker twice, an offense the Arbitrator found to be tantamount to "criminal assault and battery," (ii) reduced that co-worker to tears in public and (iii) mortified her, the Arbitrator somehow characterized the sexual harassment as only "minimally" offensive and concluded that "mitigating circumstances" required a penalty of less than termination of employment. See Tab 3: Award at 10 and 12.

27.  The Arbitrator also reached that conclusion despite having determined that Levy intentionally acted provocatively in front of AMR's management and that he twice spanked Estremera on the buttocks in front of management in an effort to upset AMR's management. See Tab 3: Award at 10 and 12. The Arbitrator agreed with AMR that Levy sought "to upset management by flagrantly slapping his female friend on the buttocks right in front of them. . . ." See Tab 3: Award at 12.

28.  Notwithstanding having found that Levy engaged in sexual harassment and that his spanking of a woman in public twice might even rise to the level of criminal assault and battery, the Arbitrator managed to conclude that AMR violated Article 15 of the CBA in terminating Levy. The Arbitrator converted the penalty of termination into a mere "written warning" and required AMR to reinstate Levy to his position without condition and to make him whole for all lost benefits, including back pay, minus interim earnings and/or unemployment benefits. See Tab 3: Award at 1 and 13.

29.  The Arbitrator concluded that the MOU, with its specific provision requiring that Levy would be terminated if he again violated AMR's Policy of Non-Discrimination and Non-Harassment, did not apply because the CBA limited that MOU to a twenty-four-month lifespan. According to the Arbitrator, on May 20, 2003, the date that Levy sexually harassed Estremera by, among other things, spanking her twice in public, Levy's employment history did not include the April 2001 suspension for purposes of imposing progressive discipline. See Tab 3: Award at 11.

30.  The Arbitrator determined that termination was not appropriate given Levy's relationship with Estremera, which he found to be a close and personal one. Despite having expressly found that Levy's offense was "the public spanking of a

woman" and that Estremera was "mortified" by the physical intimacy with her that Levy expressed in public, the Arbitrator inexplicably reasoned, as if it were applicable on the facts, that "in *less public* circumstances, [Levy's] conduct was neither unwelcome nor offensive to Ms. Estremera" and that "there was no just cause to terminate him for doing something that, in their relationship, *under less public circumstances* was acceptable conduct." See Tab 3:  Award at 12 and 13 (emphases added).

31.     The Arbitrator also opined that Levy sexually harassed Estremera within the "context of [Levy's] Union [sic] organizing of Company premises in Bridgeport, Connecticut and in Florida." See Tab 3:  Award at 12. The Arbitrator incredibly found it pertinent that Levy's sexually harassing conduct occurred after Levy "perceived" himself to have been threatened by two AMR officials at EMS Night.[3] According to the Arbitrator, the sexual harassment somehow was "steeped in the mercurial labor-management relationship that existed at the time . . ." as though that relationship

---

[3]     Notably, the Arbitrator nowhere found that Levy in fact actually had been threatened by anyone. Rather, the Arbitrator based the Award only on Levy's perception, without ever concluding whether that perception was in any way real or justified.

somehow explained or minimized behavior that the Arbitrator earlier found in the Award to have bordered on "criminal assault and battery." See Tab 3: Award at 12-13.

Respectfully submitted,

AMERICAN MEDICAL RESPONSE
OF MASSACHUSETTS, INC.,

By its attorneys,

/s/ Kevin P. Sweeney
Paul J. Murphy, BBO# 363490
Kevin P. Sweeney, BBO# 548761
Menard, Murphy & Walsh LLP
60 State Street, 34th Floor
Boston, MA 02109
(617) 832-2500

Dated: February 21, 2006

G:\B\BELLENGHI\PLEADINGS\plaintiff's statement of undisputed facts.doc