UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN MEDICAL RESPONSE OF MASSACHUSETTS, INC.　　　Plaintiff, | ) ) ) ) |
| v. | ) ) ) |
| INTERNATIONAL ASSOCIATION OF EMTs and PARAMEDICS, Local 1,　　　　Defendant. | ) ) ) ) |

CIVIL ACTION NO.: 04-11736 PBS

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

### STATEMENT OF FACTS

Defendant International Association of EMTs and Paramedics ("IAEP" or "Union") is a labor organization of which Mathew Levy, the grievant in the underlying action, is a member. At the time of Mr. Levy's termination in May 2003, he was a paramedic working a per diem schedule for AMR.

A collective bargaining agreement ("CBA") between AMR and the Union was in effect from July 6, 2000 to July 5, 2003. The CBA governed the wages, hours and other terms and conditions of employment of emt's and paramedics represented by the Union. The CBA was in effect at all times material to this action. A true and correct copy of the collective bargaining agreement is attached to the plaintiff's complaint as Exhibit "A" and is be referenced as such herein.

On May 20, 2003, at an AMR sponsored event where many employees and clients of AMR and Union representatives were present, Levy patted a close friend and former co-worker,

1

Alice Ann Estremera, on the buttocks. He also made derogatory comments about AMR management in attendance and referred to Ms. Estremera in uncomplimentary terms. Mr. Levy's actions and comments were observed and overheard by various AMR management representatives. Mr. Levy and AMR have long blustery history of confrontations arising out of his duties as an aggressive labor organizer.

AMR conducted an investigation, which included taking written statements from Ms. Estremera and other witnesses and interviewing Levy. Based on this investigation, AMR concluded that Levy was guilty of sexual harassment. AMR discharged Levy from its employ, effective May 30, 2003.

The Union filed a grievance and subsequently filed a demand for arbitration under the right to arbitration clause in the CBA.

On March 4, 2004, a hearing was conducted before arbitrator Michael W. Stutz, at which both parties appeared and were represented by counsel with the right of cross-examination. At the hearing, AMR presented testimonial and documentary evidence regarding the company's charges against Mr. Levy. The Union presented Mr. Levy's defense, including, but not limited to mitigating circumstances as found by the arbitrator.

On May 13, 2004, the arbitrator issued his Award ordering Mr. Levy's reinstatement to his per diem status and other make whole remedies. A true and correct copy of the Award is attached hereto as Exhibit "B" and is referenced as such herein.

Subsequently, AMR filed the instant complaint to vacate the arbitrator's Award.

## ARGUMENT

I.    THE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT AS THERE ARE NO GENUINE ISSUES AS TO ANY MATERIAL FACT

Summary judgment is proper if all the probative materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). According to the standards announced by the Supreme Court trilogy in *Celotex Corp. v. Catrett,* 477 U.S. 317; 106 S.Ct. 2548 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242; 106 S.Ct. 2505 (1986), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574; 106 S.Ct. 1348 (1986), "the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson,* 477 U.S. at 247-48, 106 S.Ct. at 2509-10. (emphasis in original).

The moving party must make an initial showing that there is no genuine issue of material fact. *Celotex,* 477 U.S. at 323; 106 S.Ct. at 2552. After the movant discharges this burden, the nonmovant must do more than show that there is some doubt as to the facts. *Matsushita,* 475 U.S. at 577; 106 S.Ct. at 1351. The nonmovant "may not rest upon mere allegations or denials" of its pleading, Fed. R. Civ. P. 56(e), but must produce sufficient evidence that will reasonably support a jury verdict in its favor," *Anderson,* 477 U.S. at 249; 106 S.Ct. at 2508, and not just "some metaphysical doubt as to material facts." *Matsushita,* 475 U.S. at 586; 106 S.Ct. at 1355. Instead, the nonmovant bears the burden of setting forth specific facts showing that there is sufficient evidence to return a verdict for it. *Celotex,* 477 U.S. at 324; 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 249; 106 S.Ct. at 2508.

In this case, the parties have stipulated and all probative materials of record (AMR/IAEP collective bargaining agreement and the arbitrator's award) demonstrate that no material facts are in dispute, so the defendant is entitled to judgment as a matter of law.

II.   JUDICIAL VACATUR OF AN ARBITRATOR'S AWARD IS SUBJECT TO THE
      ARBITRATOR'S CONTRACTUAL INTERPRETATION AND COURTS MUST
      REFRAIN FROM DEPRIVING PARTIES TO A COLLECTIVE BARGAINING
      AGREEMENT THE BENEFITS OF THEIR BARGAIN

The U. S. Supreme Court, as well as numerous circuit courts, has established clear

guidelines and standards regarding judicial review of labor arbitrator's awards. Among the first

cases addressing the issue of judicial review of labor arbitration awards were the three 1960

Supreme Court cases commonly referred to as the *Steelworkers Trilogy*.  See *Steelworkers of

America v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, (1960) (" *American

Manufacturing* "); *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S.

574, 80 S.Ct. 1347 (1960) ("*Warrior & Gulf Navigation*"); and *United Steelworkers of America

v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358 (1960) ("*Enterprise Wheel*"). In

decisions after the *Steelworkers Trilogy*, the Court reaffirmed the standards established those

decisions as well as defining the standards with respect to public policy considerations. *See W.R.

Grace and Co. v. Local Union 759,* 461 U.S. 757, 770, 103 S.Ct. 2177 (1983) ("*W.R. Grace*"),

*United Paperworkers v. Misco,* 484 U.S. 29, 38, 108 S.Ct. 364 (1987) (*"Misco"),* and *Eastern

Associated Coal Corporation v. United Mine Workers Of America, District 17, et al*. 531 U.S.

57, 121 S.Ct. 462 (2000) (*"Eastern Associated Coal"* ).

*American Manufacturing* articulated the courts' position with respect to review of

arbitrators' awards. Essentially, it urged reviewing courts to refrain from inserting themselves

into the bargained for contract language agreed upon by the parties. 363 U.S. at 568; 80 S.Ct. at

1346.  The *American Manufacturing* court held that where:

> "[t]he collective agreement calls for the submission of grievances in the
> categories which it describes, irrespective of whether a court may deem them to
> be meritorious … The function of the court is very limited when the parties have
> agreed to submit all questions of contract interpretation to the arbitrator. It is
> confined to ascertaining whether the party seeking arbitration is making a claim

4

which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for." *Id.*

Further, the *American Manufacturing* court drew upon the federal Labor Management Relations Act, 29 U.S.C. § 173(d) (2000), and stated congressional preference regarding resolution of labor disputes, 'Final adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement. * * *', *Id.* at page 566; S.Ct. at 1345, 1346. Subsequent court decisions described reviewing the arbitral decision with great 'deference.' (See below.) Lastly, the simplest instruction from *American Manufacturing* is that the arbitrator is the sole interpreter of the terms of the parties' contract. *Id.*

In *Warrior & Gulf Navigation* the court further expounded on the role of courts when reviewing arbitral awards. 363 U.S. at 578-81; 80 S.Ct. at 1350- 53. It recognized that the collective bargaining agreement was a specialized document, formed in the context of an industrial environment that may not be entirely familiar to the courts. *Id.* The collective bargaining agreement, the court stated, "is a generalized code" that governs "a myriad of cases which the draftsman cannot wholly anticipate," *Id.* at 578; S.Ct. at 1350. The arbitrator, therefore, is a trier of fact who "performs functions which are not normal to the courts; the considerations which help him fashion judgments may indeed by [sic] foreign to the competence of courts." *Id.* at 581; S.Ct. at 1352. Giving the arbitrator the benefit of the doubt, as it where, the *Warrior & Gulf Navigation* decision acknowledged that the arbitrator is the parties' chosen expert who knows the "industrial common law – the practices of the industry and the shop" and

brings with him "knowledge of the common law of the shop" and in him resides the parties'
"trust in his personal judgment to bring to bear considerations which are not expressed in the
contract as criteria for judgment." *Id*. at 582; S.Ct. at 1353.

Finally, of the three *Steelworker*s decisions, *Enterprise Wheel* is most pertinent to AMR's
complaint to vacate the arbitrator's award in favor of Levy. The court speaks to the arbitrator's
"informed judgment," and his expertise "when it comes to formulating remedies." 363 U.S. 597;
80 S.Ct. at 1361. When evaluating the arbitrator's authority to determine the merits of a
contractual dispute, the Court stated, that while the arbitrator is "confined to interpretation and
application of the collective bargaining . . . he may of course look for guidance from many
sources" and his award is legitimate "only so long as it draws its essence form the collective
bargaining agreement." *Id*.

Accordingly, to determine whether an arbitrator's award actually draws its essence from
the parties' contract, pertinent language of the contract must be reviewed to find the authority for
the arbitrator to fashion a remedy. *Id*. at 598; S.Ct. at 1361. In *Enterprise Wheel*, the court re-
stated its finding in *American Manufacturing* that the "question of interpretation of the collective
bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was
bargained for; and so far as the arbitrator's decision concerns construction of the contract, the
courts have no business overturning him because their interpretation of the contract is different
from his." *Id*. at 599.

Furthermore, the collective bargaining agreement between AMR and the IAEP contains
language similar to that discussed in each of the *Steelworker Trilogy* cases. For example, in
*American Manufacturing* the operative contract language was the arbitration clause of the
parties' collective bargaining agreement. 363 U.S. at 565; 80 S.Ct. at 1345.  See Article 16,

6

exhibit A. The relevant arbitration provisions at issue in *American Manufacturing* reads as follows:

> '**Any disputes, misunderstandings, differences or grievances arising between the parties as to the meaning, interpretation and application of the provisions of this agreement, which are not adjusted as herein provided, may be submitted to the Board of Arbitration for decision**. * * *'**The arbitrator may interpret this agreement and apply it to the particular case under consideration but shall, however, have no authority to add to, subtract from, or modify the terms of the agreement.** Disputes relating to discharges or such matters as might involve a loss of pay for employees may carry an award of back pay in whole or in part as may be determined by the Board of Arbitration.
> 'The decision of the Board of Arbitration shall be final and conclusively binding upon both parties, and the parties agree to observe and abide by same. * * *' *Id.* (FN 1.) (emphasis supplied.)

Additionally, in *Warrior & Gulf Navigation* the operative contract language was also the arbitration clause of the parties' collective bargaining agreement. See Article 16, exhibit A. The relevant arbitration provisions at issue in *Warrior & Gulf Navigation* reads as follows:

> '**Should differences arise between the Company and the Union or its members employed by the Company as to the meaning and application of the provisions of this Agreement**, or should any local trouble of any kind arise, there shall be no suspension of work on account of such differences but an earnest effort shall be made to settle such differences immediately in the following manner:
> 'Fifth, ...if agreement has not been reached the matter shall be referred to an impartial umpire for decision  ….  The decision of the umpire will be final.' *Id.* (emphasis supplied.)

Finally, in *Enterprise Wheel* the determinative contract language was also the arbitration clause. 363 U.S. at 576; 80 S.Ct. at 1349-50. The *Enterprise Wheel* decision provided minimal reference to the arbitration clause, but noted that the parties' collective bargaining agreement provided that any differences 'as to the meaning and application' of the agreement should be submitted to arbitration and that the arbitrator's decision 'shall be final and binding on the parties.' Id. (quoting the CBA's terms.) See Article 16, exhibit A.

Likewise, the AMR/IAEP collective bargaining agreement contains similar language granting the arbitrator authority to decide disputes arising out of the terms of the contract and the daily intercourse between management and labor. (See CBA, Art. 4, 15 and 16.) Such interaction is an area in which the court have presumed that the arbitrator has greater familiarity with the industrial work environment than the courts. *See, United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 45; 108 S. Ct. 364, 374 (1987).

In the operative language of the CBA, AMR and the IAEP have agreed upon management's "right to hire, assign, suspend, transfer, promote, discharge or discipline for just cause," Article 4.2; Article 15.1 represents and emphasizes the parties' intent to discipline only if just cause is found, "the Employer shall neither discipline nor discharge any employee without just cause." In Article 15.2, "the Employer and the Union recognize the concept of progressive discipline. The Employer shall follow progressive disciplinary procedures before discharging an employee." (emphasis supplied.)

These articles serve as a grant of authority to the arbitrator that allows him or her to review the grievant's record, the facts of the case and the previously imposed discipline. In doing so, the arbitrator has authority, granted by the parties, to fashion an alternate, appropriate remedy if he or she finds there was no just cause for the discipline imposed and if he or she finds the discipline is not in compliance with progressive discipline. In Article 15.2, the parties' agreement that prior discipline has a specific, limited shelf life further authorizes the arbitrator to fashion a remedy if he or she finds that the grievant's personnel file contains discipline that has, by the terms of the contract, become stale, should be expunged and was a factor considered in the discipline implemented. (CBA.) Specifically, instances of suspension must be removed from personnel files after "24 Months." *Id*. As the arbitrator's award indicates, a prior suspension was

rejected as "expired and [ ] inapplicable to progressive discipline." (Arb. Award pp. 11-12.) This finding caused the progressive discipline procedure to result in a much different result than the termination originally imposed by AMR – whereby the arbitrator reduced Levy's termination to a written reprimand. Such an interpretation of the contract and its application to the facts are squarely within the grant of authority to the arbitrator by the parties' contract. *See, e.g., Eastern Associated Coal,* 531 U.S. at 62; 106 S.Ct. at 467.

Article 16.1 defines the limits of the grievance procedure to issues "concerning the interpretation or application of any of the terms of this Agreement, and/or any dispute concerning wages, benefits and working conditions, such matters shall be adjusted according to the procedures and conditions set forth below." [Description of step hearings I and II omitted.] (CBA.)

Step Three of the grievance procedure establishes limits on the arbitrator's authority. Here, as in the *Steelworkers Trilogy* cases, the **"arbitrator's decision shall be final and binding on the Employer, the Union, and the employee(s) involved. …. The arbitrator shall have no power to add to, subtract from, or otherwise modify any provision of this Agreement."** See *American Manufacturing,* 363 U.S. at 599; 80 S.Ct. at 1345. (emphasis supplied.)

Finally, the *Enterprise Wheel* arbitrator reduced terminations to suspensions. It was his decision dutifully arrived at by his interpretation of the applicable language in the parties' collective bargaining agreement and the facts presented in the arbitration hearing.

As the Supreme Court observed, "the arbitrator found that the discharge of the men was not justified, though their conduct, he said, was improper. In his view the facts warranted at most a suspension of the men for 10 days each." *Enterprise Wheel* 363 U.S. at 595'; S.Ct. at 1360.

The court noted:

"… we see no reason to assume that this arbitrator has abused the trust the parties confided in him and has not stayed within the areas marked out for his consideration. It is not apparent that he went beyond the submission. The Court of Appeals' opinion refusing to enforce the reinstatement and partial back pay portions of the award was not based upon any finding that the arbitrator did not premise his award on his construction of the contract. It merely disagreed with the arbitrator's construction of it." *Id.* at 598; S.Ct. at 1361.

Hence, the lesson of *Enterprise Wheel* is that courts may not vacate arbitrators' awards on mere disagreement with the award itself.

As prescribed by the *Steelworkers Trilogy*, the arbitrator herein founded his award upon specific articles in the AMR/IAEP contract. On the issue of prior misconduct that resulted in a suspension from employment, the Union asked the arbitrator to remove from his consideration of the prior suspension based upon the "24 month" limitation period.

Article 15.2.1 Warning Notices, provides that, "[t]he Employer may maintain such notices on file as part of the employee's employment history as follows:

Verbal Warning – 12 Months
Written Warning – 18 Months
Suspension – 24 Months

The arbitrator's discussion, pages 11 through 12, states

While it is true that the MOU does not have a defined expiration date, it is also true that it is a negotiated discipline that provides for a disciplinary suspension of the grievant of about 17 days. As a member of the bargaining unit, the grievant is entitled to the benefit of the 24-month limitation in the usefulness of a suspension for progressive discipline. By the terms of the Agreement, the Employer may only maintain a notice of a suspension in the employee's employment history or 24 months. Applying that 24-month limitation to the MOU means that it expired April 7, 2003. Therefore, on May 20, 2003, the date of the incident at issue, the grievant's employment history did not include the suspension for purposes of progressive discipline.

10

>Therefore, the MOU expired and is inapplicable to progressive discipline.

The Levy arbitrator's award impacts two significant sub-sections of Article 15, the requirement of just cause and the requirement of progressive discipline, sub-section 15.1.

When the arbitrator interpreted the contract language (as he was authorized to do) and decided, correctly, to disregard the prior discipline and instead imposed a lesser, progressive discipline, he was crafting his award from the essence of the parties' agreement in accord with the *Steelworkers Trilogy* and subsequent Supreme Court cases cited herein.

Accordingly, in light of the *Steelworkers Trilogy* cases, the Levy arbitrator's decision should be upheld, AMR's motion for summary judgment should be denied and Defendant's motion for summary judgment be allowed.

III.    VACATUR OF AN ARBITRATOR'S AWARD ON PUBLIC POLICY GROUNDS MUST BE SUPPORTED BY AN EXPLICIT, WELL DEFINED AND DOMINANT PUBLIC POLICY

Courts have held that that an arbitrator's award should be enforced, or, alternatively, that courts should not displace the arbitrator's interpretation of the contractual language with their own. *Eastern Associated*, 531 U.S. at 62, 121 S. Ct. at 466-67; *Misco*, 484 U.S. at 38, 108 S. Ct. at 364; *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S. Ct. 2399 (1986); *W.R. Grace*, 461 U.S. at 766, 103 S. Ct. at 2177; *Enterprise Wheel*, 363 U.S. at 596; *Weber Aircraft, Inc. v. General Warehousemen and Helpers Union Local 767*, 253 F.3d 821 (5th Cir. 2001); *Westvaco Corp. v. United Paperworkers Int'l Union*, 171 F.3d 971 (4th Cir. 1999); *Exxon Corp. v. Esso Workers' Union*, 118 F.3d 841 (1st Cir. 1997); *Chrysler Motors Corp. v. International Union, Allied Ind. Workers*, 959 F.2d 685 (7th Cir. 1991); *Newsday, Inc. v. Long Island Typographical Union*, 915 F.2d 840 (2nd Cir. 1990); *Communication Workers of America v. Best Atlantic—West Virginia, Inc.*, 27 F. Supp. 2d 66 (D.D.C. 1998). There are, however, limited

exceptions to this standard. *Misco*, 484 U.S. at 38-42. In the instant case the plaintiff raises the public policy exception to enforcing the arbitrator's award of reinstating Levy to his per diem employment. AMR claims that the award "was made in manifest disregard of federal law" and as such violates Title VII of the Civil Rights Act of 1964, 42 U.S.C §2000e et seq. (Title VII). See plaintiff's complaint, page 1. *Eastern Associated Coal*, 531 U.S. at 62, 121 S. Ct. at 466-67; *Misco*, 484 U.S. at 38, 108 S. Ct. at 364.

    As the cited cases illustrate, the award does not violate Title VII and, therefore, does not invoke the public policy exception. Indeed, the award reinstating Levy does not violate any specific provision of the collective bargaining agreement, EEOC sexual harassment guides, or Title VII.

    The U.S. Supreme Court, as well as the circuit courts cited above, has established a standard for review of arbitrators' decisions challenged on violation of public policy grounds. The cases appealed generally oppose reinstatement of employees terminated for alleged violations of public policy, and in this case for a violation of a sexual harassment policy and non-specified Equal Employment Opportunity Commission standards. *See Eastern Associated Coal*, 531 U.S. at 62, 121 S. Ct. at 466-67; *Misco*, 484 U.S. at 38, 108 S. Ct. at 364; collective bargaining agreement, Exhibit 1, Article 19 (a reference to EEOC standards without citing specific sections alleged to apply to bargaining unit employees.).

    The current law regarding vacatur of arbitration awards of public policy grounds derive originally from two Supreme Court cases, *W.R. Grace 759,* 461 U.S. 757, 770, 103 S.Ct. 2177; *Misco,* 484 U.S. at 29, 108 S.Ct. at 371; and is continued in *Eastern Associated Coal,* 531 U.S. 57, 121 S.Ct. 462.

a. <u>W.R. Grace</u>.

In *W.R. Grace* the Court reviewed an arbitrator's award that was under attack by the appellant employer for violation of Title VII of the Civil Rights Act of 1964.

Citing back to *Enterprise Wheel*, the first premise recognized by the court in its discussion on the issue presented "whether the [arbitrator's] award should be enforced," *W.R. Grace*, 461 U.S. at 764. *Enterprise Wheel* held that "a federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one. *Enterprise Wheel,* 363 U.S. at 596, 80 S.Ct. at 1360. When the parties include an arbitration clause in their collective bargaining agreement, they choose to have disputes concerning constructions of the contract resolved by an arbitrator**. Unless the arbitral decision does not 'dra[w] its essence from the collective bargaining agreement,'** *Id.,* **at 597, 80 S.Ct., at 1361, a court is bound to enforce the award and is not entitled to review the merits of the contract dispute**. **This remains so even when the basis for the arbitrator's decision may be ambiguous.** *Id.,* **at 598, 80 S.Ct., at 1361."** At page 764. (emphasis supplied.)

As demonstrated by the parties' contract language cited above (Articles 15 and 16), the parties' method to resolve their contractual disputes is to submit those disputes to a neutral arbitrator of their choosing. They did not elect to have their contractual differences and difficulties resolved by either state or federal courts.

The *W.R. Grace* decision then stated the obvious, "''a court may not enforce a collective bargaining agreement that is contrary to public policy. *See Hurd v. Hodge,* 334 U.S. 24, 34-35, 68 S.Ct. 847, 852-53 (1948). .... and, in any event, the question of public policy is ultimately one for resolution by the courts," at page 766. The *W.R. Grace* court continued and explained judicial limits on the pubic policy exception, "Such a public policy, however, must be **well defined** and

**dominant**, and is to be ascertained "**by reference to the laws and legal precedents and not from general considerations of supposed public interests**." *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)," at page 766. (emphasis supplied.) The Court found that enforcing the contract (with respect to seniority provisions) would not violate the public policy of Title VII as to discriminatory hiring policies and ordered the arbitrator's award enforced.

      b. <u>Misco</u>.

      Similar to the issues presented here, the *Misco* case addressed the court's authority to review an arbitrator's award that impacted public policy (drug use). As in *W.R. Grace,* the *Misco* court founded its order to enforce the arbitrator's award on the *Enterprise Wheel* premise that, "courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract. "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Enterprise Wheel,* 363 U.S. at 596, 80 S.Ct. at 1360. As long as the arbitrator's award "draws its essence from the collective bargaining agreement," and is not merely "his own brand of industrial justice," the award is legitimate. *Id.,* at 597, 80 S.Ct., at 1361," *Misco*, 363 US at 36.

      Additionally, the *Misco* decision referenced federal statutes regulating labor management relations, "[t]hese statutes reflect a decided preference for private settlement of labor disputes without the intervention of government: The Labor Management Relations Act of 1947, 29 U.S.C. § 173(d), provides that "[f]inal adjustment by a method agreed upon by the parties is

14

hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement," *Id.* at 370.

    c. <u>Eastern Associated Coal</u>

In *Eastern Associated Coal* (employer brought an action in district court seeking to vacate arbitration award which reinstated recidivist employee discharged for failing drug test claiming the award violated public policy), continues the course set out in *W.R. Grace* and *Misco* regarding the public policy exception to reinstatement by arbitral award of employees discharged for reasons other than those arising solely out the collective bargaining agreement.

Initially, the Court stated that:

> "we must assume that the collective-bargaining agreement itself calls for Smith's reinstatement. That is because both employer and union have granted to the arbitrator the authority to interpret the meaning of their contract's language, including such words as "just cause." See *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 599, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). They have "bargained for" the "arbitrator's construction" of their agreement. *Ibid.* And courts will set aside the arbitrator's interpretation of what their agreement means only in rare instances. *Id.,* at 596, 80 S.Ct. 1358. Of course, an arbitrator's award "must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice." *Paperworkers v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). "But as long as [an honest] arbitrator is even arguably construing or applying the contract and acting within the scope of his authority," the fact that "a court is convinced he committed serious error does not suffice to overturn his decision." *Ibid.*; see also *Enterprise Wheel, supra,* at 596, 80 S.Ct. 1358 (the "proper" judicial approach to a labor arbitration award is to "refus[e] ... to review  the merits")," at page 466.

The *Eastern Associated Coal* arbitrator's award was firmly grounded in the terms of the parties' collective bargaining agreement. With respect to the AMR/IAEP collective bargaining agreement, Articles 4 and 15 prohibit discipline – termination – without just cause. Article 15 also requires that discipline be progressive where the employer may have just cause to implement discipline. Article 16 grants the arbitrator the authority to decide disputes over the

"interpretation or application of any terms" contained in the collective bargaining agreement. Article 16 also allows that the "arbitrator's decision shall be final and binding on the Employer, the Union, and the employee(s) involved." The arbitrator here followed the prescription on how to decide contractual disputes by following the parties' command as contained in the collective bargaining agreement. He also dutifully interpreted the contract by drawing his award from the essence of the contract by considering Article 15 limitations on prior discipline and by reducing the termination to a written reprimand in accord with Article 15's progressive discipline policy. Further, the arbitrator considered AMR's corporate sexual harassment policy when arriving at his decision to reduce the termination to a written reprimand. It is notable that the policy contained only instructions for reporting alleged incidents of sexual harassment to the human resources department, but provided no direction for discipline should those harassment charges be proved.

The relevant contract articles when read with the sexual harassment policy left the arbitrator room to formulate a suitable remedy based upon the language of the parties' collective bargaining agreement the application to the facts. Since the arbitrator unmistakably grounded his award in specific contract articles and his interpretation of those articles, the claim that the arbitrator acted outside of his contractual grant of authority must fail. The arbitrator's remedy is also grounded in the terms of parties' collective bargaining agreement (Articles 4 and 15). The provisions of no discipline without just cause impliedly, if not expressly, authorizes the arbitrator to fashion a remedy in the event that the employer is without just case to discipline an employee. By reinstating the grievant with a written reprimand, the arbitrator relied on the parties' progressive discipline policy, (the failure of) the sexual harassment policy (Article 19) to absolutely require termination (instead a range of possible discipline is available) and the

16

command that author is to adjudicate disputes "concerning the interpretation or application of the terms of the Agreement," Article 16.1.

In *Eastern Associated Coal*, after reviewing the parties' collective bargaining agreement regarding the arbitrator's authority to interpret the meaning of the contract, the court held that the "collective-bargaining agreement itself calls for [the grievant's] reinstatement … because both employer and union have granted to the arbitrator the authority to interpret the meaning of their contract's language, including words such as 'just cause.' 531 U.S. at 61, 121 S.Ct. at 466.

The second issue addressed by the *Eastern Associated Coal* court was not whether the conduct violated public policy, but whether "a contractual reinstatement requirement would fall within the legal exception that makes unenforceable "a collective-bargaining agreement that is contrary to public policy." *W.R. Grace & Co. v. Rubber Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177 (1983), at 62, 467.

Finally, the court reached the ultimate "question to be answered." *Eastern Associated Coal* at 531 U.S. at 62; 121 S.Ct. at 467. It was not whether [the misconduct] itself violates public policy, but whether the agreement to reinstate him does so." *Id*. at 62, 63. Referencing earlier cases reviewing deference to arbitrator's awards and the impact of the public policy exception, the *Eastern Associated Coal* court repeated the standard for the application of the public policy exception. Such a policy must be "explicit," "well defined," and "dominate" and "ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " *Ibid.* (quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945)); accord, *Misco, supra,* at 43, 108 S.Ct. 364," *Id*. at 62, S.Ct. at 467. There is no public policy cited in either the parties' contract, AMR's sexual harassment policy or the EEOC guidelines that expressly bar reinstatement of Levy to per diem employment.

In fact, the EEOC guidelines stress education, prevention, and urge employers to "develop methods to sensitize all concerned." See below EEOC Guidelines on Discrimination Because of Sex, section 1604.11(f).

The Court should therefore grant summary judgment for the defendant as the arbitrator's award does not violate a positive law exception.

IV. THE SEXUAL HARASSMENT POLICY OF THE IAEP CONTRACT, AMR'S POLICY AGAINST SEXUAL HARASSMENT AND EQUAL EMPLOYMENT OPPORTUNITY SEXUAL HARASSMENT GUIDELINES DO NOT ESTABLISH WELL DEFINED AND DOMINATE PUBLIC POLICY IMPERATIVES SO AS TO ALLOW THE VACATUR OF THE LEVY ARBITRATION AWARD

While AMR disputes the validity of the award, it does not have legal support to have the award vacated on public policy, or any other, grounds. The public policy at issue here is not so 'well defined and dominate' so as to be identified "by reference to the laws and legal precedents and not from general considerations of supposed public interests," *W.R. Grace*, 461 U.S. at 764-64.

a. <u>IAEP Contract</u>

AMR cannot show that there is any well-defined and dominant public policy that specifically prohibits Levy from reinstatement expressed in its contract - the agreement mandates discipline only with a showing of just cause, the parties have authorized the arbitrator to interpret the terms of the agreement, and they have agreed that his or her decision be final and binding. Therefore, the Levy arbitrator's award is firmly grounded in and draws its essence from the collective bargaining agreement.

Article 4, Management Rights and Article 15, Discipline and Discharge, require that discipline be implemented only for just cause. In Article 15.2, Procedure, both "the Employer

and the Union recognize the concept of progressive discipline" and agree to "follow progressive disciplinary procedures before discharging an employee."

According to the AMR/IAEP collective bargaining agreement termination is not the exclusive discipline to be imposed for sexual harassment. Article 15, by its own terms, allows for discipline other than termination such as reprimands or suspension.

Article 16 establishes an arbitration procedure that grants to a mutually agreed upon arbitrator the power to resolve disputes "concerning the interpretation or application of any of the terms of this Agreement, and/or any dispute concerning wages, benefits and working conditions." It further provides in paragraph 5, Article 16.1, that "the arbitrator's decision shall be final and binding on the Employer, the Union, and the employee(s) involved . . .. The arbitrator shall have no power to add to, subtract from, or otherwise modify any provision of this Agreement."

Article 19, Sexual Harassment, of the collective bargaining agreement, contains a brief, even cursory, statement that sexual harassment is a form of misconduct that "cannot be tolerated in the workplace."

Article 19, also allows that "any employee found to have engaged in sexual harassment will be subject to discipline **up to and including immediate termination**." (Emphasis supplied.) This article, while it does provide for discipline in instances of sexual harassment, merely provides for discipline, it does not expressly provide for immediate termination. This interpretation, possibly the same interpretation reached by the arbitrator, read in conjunction with the progressive discipline policy agreed upon in Article 15 subjects the Sexual Harassment policy to the demand that misconduct be meet with progressive discipline and not the ultimate industrial discipline – termination. Neither AMR nor IAEP, through their collective bargaining

agreement, has deemed it necessary to terminate an employee who has been accused of sexual harassment. The Court should not put such a burden on the parties' where they have elected not to do so themselves.

Article 19, cites to Equal Employment Opportunity Commission ("EEOC") standards to provide definitions of sexual harassment. While not specifically identified, it is presumed that the reference is to 29 C.F.R. § 1604.11, the EEOC's sexual harassment guidelines. Indeed, the parties' collective bargaining agreement does not expressly incorporate AMR's sexual harassment policy, but rather only references the EEOC guidelines.See next below.

b. Equal Employment Opportunity Commission Sexual Harassment Guidelines

The EEOC guidelines do not establish well defined and dominate public policy standards that prohibit enforcement of this award.

Sub-section (a) defines sexual harassment as

> "Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11

However, rather than an outright termination of alleged sexual harassers, the EEOC guidelines urge preventative and educational measures to reduce and eliminate instances of sexual harassment from the workplace.

Section (f) provides that:

> "Prevention is the best tool for the elimination of sexual harassment. An employer should take all steps necessary

> to prevent sexual harassment from occurring, such as
> affirmatively raising the subject, expressing strong
> disapproval, developing appropriate sanctions, informing
> employees of their right to raise and how to raise the issue
> of harassment under Title VII, and developing methods to
> sensitize all concerned." 29 C.F.R. § 1604.11

These sub-sections of the EEOC guides complement the parties' agreement that

progressive discipline is preferred method of correcting employee misconduct. They do not,

however, prohibit the arbitrator's award to reinstate Levy to per diem employment. The EEOC

guidelines, like the parties' collective bargaining agreement, do not mandate the termination of

an employee who has been accused of sexual harassment. The Court should not put such a

burden on the parties' where the EEOC guidelines (adopted by the parties) do not require such a

result.

c. <u>AMR's Policy Against Harassment</u>

> <u>The Company's policy against harassment:</u>
>
> AMR will not tolerate any form of unlawful harassment by
> or against any of our employees during working time in
> connection with business or work-related functions.
> Moreover, AMR will not tolerate harassment that is based
> on an employee's sex…. Harassment is conduct that has
> the purpose or effect of unreasonable interfering [sic] with
> an individual's work performance by creating an
> intimidating, hostile or offensive working environment. It
> can include verbal abuse or insults, demeaning jokes or
> innuendoes, gestures or physical contact and display or
> circulation of demeaning pictures or materials. It includes
> conduct by anyone employed by AMR, affiliated with it or
> doing business with it, including clients.
>
> Sexual harassment is behavior directed at an individual on
> the basis of their gender, which is not welcome, is
> offensive, affects morale and as a result, interferes with the
> work effectiveness of the victim. Sexual harassment is the
> workplace is unlawful. Unwelcome sexual advances,
> requests for sexual favors and other verbal or physical

conduct will not be tolerated at AMR.  In particular, sexual harassment includes any conduct when:

- Submission to such conduct is made either explicitly or implicitly a term or condition or employment; or

- Submission to or rejection of such conduct is used as the basis for employment decisions affecting an individual; or
- Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

If a supervisor or manager becomes aware of an incident of … harassment (whether or not the incident involves a person in particular person's area of responsibility or oversight), that must be reported to the Human Resources Department.

First, it must be noted that Article 19, Sexual Harassment, does not incorporate AMR's Policy Against Sexual Harassment. The Arbitrator cited excerpted portions of AMR's 'policy against harassment. See above and pages 8-9. While the policy details descriptions of what it considers to be sexual harassment, the individuals to which it applies the policy, the work place impact of instances of sexual harassment, and report procedures**, it does not include a punishment for such conduct.** The only reference to punishment in this matter is found in Article 15 and, notwithstanding any other contractual agreement, the discipline that can be imposed is subject to one, just cause and two, progressive discipline.

Accordingly, the requirement that there be a well defined and dominate policy for which to base a vacation of this arbitrator's award is not to be found in the parties' contract, AMR's sexual harassment policy or the Equal Employment Opportunity Commission's guidelines against sexual harassment. As discussed herein there is also no substantial case law in support of

AMR's complaint to vacate the arbitrator's award. In fact, a substantial body of law, cited herein, holds that an arbitrator's award must be affirmed.

Finally, there must be some considerable doubt whether or not the arbitrator's findings clearly deemed Levy's conduct to be 'sexual harassment.' Admittedly, the arbitrator's award did find that "the grievant's conduct was only minimally sexual harassment," arbitrator's award at page 11. That finding, however, is diminished, if not actually negated, by the following clause that "it is undisputed really that [the conduct] was socially inappropriate in such a professional and public setting." It is not reasonable to conclude that, although the arbitrator's interpretation of the event is ambiguous, the actual finding is that the conduct that caused Levy's termination was not sexual harassment by definition, but only distasteful, 'socially inappropriate' behavior 'in such a professional public setting.' The arbitrator has recognized that the 'patting' was mutual and 'normal in their platonic friendship;' that the alleged victim 'would never have complained about the grievant's behavior had the Company not pursued the matter;" and, "[w]hile none of the mitigating circumstances excuse the grievant's behavior, they require modification of the penalty.  Considering the grievant's friendship with Ms. Estremera and the adversarial labor relationship between Levy and AMR management (the mitigating circumstances) there was no just cause to terminate him for doing something that, in their relationship, under less public circumstances was acceptable conduct," arbitrator's award at pages 12, 13.

## CONCLUSION

Based on the foregoing, the plaintiff's motion for summary judgment must be denied, the defendant Union's motion for summary judgment be allowed and the Levy arbitration award be enforced as to the terms contained therein.

THE DEFENDANT RESPECTFULLY REQUEST ORAL ARGUMENT ON THIS MOTION.

> Respectfully submitted,
> International Association of
> EMTs and Paramedics
> By its Attorney
>
>
> s/ Timothy G. Bailey
> Timothy G. Bailey
> (BBO#560308)
> 159 Burgin Parkway
> Quincy, MA 02169
> (617) 376-0220

Dated:  February 21, 2006

## CERTIFICATE OF SERVICE

I, Timothy G. Bailey, Esq., counsel for the International Association of EMTs and Paramedics, 159 Burgin Parkway, Quincy, MA 02169, do hereby certify that on this 21st day of February 2006, I served a copy of the defendant's Motion for Summary Judgment on Paul J. Murphy, Esq., Menard, Murphy & Walsh, LLP, 60 State St., 34th Floor, Boston, MA 02109, by first class mail, postage pre-paid.

Signed under the pains and penalty of perjury this     21st     day of February 2006.

s/Timothy G. Bailey, Esq.
Timothy G. Bailey, Esq.