AMERICAN ARBITRATION ASSOCIATION
ARBITRATOR'S OPINION & AWARD

Before Michael W. Stutz, Arbitrator

---

In the Matter of Arbitration between

INTERNATIONAL ASSOCIATION OF EMT'S &
PARAMEDICS, LOCAL 1

-and-

AMERICAN MEDICAL RESPONSE OF MASSACHUSETTS,
INC.

*Matthew Levy Discharge*
*AAA Case No. 1130-1678-03*

---

### AWARD of the ARBITRATOR

The undersigned arbitrator, having been designated in accordance with the Parties' arbitration agreement, and having duly heard the proofs, allegations and contentions of the Parties, AWARDS as follows:

> 1. The Employer violated Article 15 of the collective bargaining agreement when it terminated the grievant, Matthew Levy.
> 2. As remedy, the penalty of termination is converted to a written warning. The Employer shall reinstate the grievant to his former per diem position and make him whole for lost benefits under the Agreement, including back pay, minus interim earnings and/or unemployment benefits.
> 3. The undersigned retains jurisdiction limited to disputes about implementation of the remedy for 60 days.

May 13, 2004

Michael W. Stutz

## BACKGROUND

A hearing in this matter was held in Boston, Massachusetts on March 4, 2004, before the undersigned, appointed arbitrator by the parties through the Boston offices of the American Arbitration Association where Adrianne C. Pusateri was Case Manager. Timothy G. Bailey, Esq. appeared on behalf of the Union. Collins & Bellenghi, LLP, by Michael J. Collins, Esq., represented the Employer. Written closing arguments from both parties were mailed to the undersigned on April 27, 2004.

## AGREED ISSUES

The parties submitted the following questions to arbitration:

> 1) Did the Employer violate the collective bargaining agreement Article 15 when it terminated the grievant, Matthew Levy?
> 2) If so, what shall be the remedy, if any?

## STATEMENT OF THE CASE

American Medical Response of Massachusetts, Inc. (the "Company," "Employer," or "management") and the International Association of EMT's & Paramedics, Local 1 (the "Union") are parties to a collective bargaining agreement effective from July 6, 2000 to July 5, 2003 (the "Agreement" or "Contract") that provides for the arbitration of disputes. This matter involves the Company's decision to terminate a Union organizer for violating its policy against sexual harassment.

The Company, a national provider of ambulance services, has a broad policy against sexual harassment. This policy prohibits sexual harassment and imposes an obligation upon management witnesses of sexual harassment to report such an incident to Human Resources.

The grievant worked for the Company beginning in 1995 as an emergency medical technician, and then as a paramedic. He became increasingly involved with the Union. In 1999 he was appointed shop

2

steward by the Union Executive Board. Then in 2000 he was appointed vice president of Region 5 of Local 1. In April 2001 he began to work full time for the Union as a national representative, while continuing to work for the Company on a per diem basis.

After the grievant was promoted to the position of eastern states director of organizing in September 2002, he became directly involved in all of the Union's organizing drives of ambulance companies east of the Mississippi River. One of the grievant's organizing drives was in Bridgeport, Connecticut where he was working to unionize one of the Employer's non-union shops. He also was trying to organize another non-union ambulance company in Florida that is owned by the Employer.

The grievant's Union activities occasionally brought him into contact with the Company's national vice president for labor relations, David Banelli, particularly when there were important issues to resolve. However, most of his contact for labor relations issues was with Robert Zagami, vice president of human resources for the east region.

The grievant was the subject of a memorandum of understanding (the "MOU") dated April 7, 2001 that settled a dispute between the parties concerning the grievant's conduct and his work for the Employer. The MOU gave the grievant a 17-day (calendar) disciplinary suspension from work for violating the Company's policy of non-discrimination and non-harassment. The MOU provides:

> In the event that the (sic) Matthew Levy repeats the above-mentioned offense, the employee will be terminated.

As the result of an incident on May 20, 2003, the grievant was terminated for violating the policy against harassment.

The grievant and Alice Ann Estremera are close personal friends who met while working together at the Newton, Massachusetts ambulance station. They have known each other for about five years. In Newton, they shared 12-hour shifts about once a week. There often were quiet periods during these shifts when the four employees who shared the

station ate meals together and watched television. The group of co-workers became close friends who socialized outside of work, including weddings, barbecues and a trip to Virginia. At the time, Ms. Estremera was involved in a relationship with another Company employee, Mr. Hansen. The two were in a car accident that claimed Mr. Hansen's life. As a result, Ms. Estremera went out of work suffering from post-traumatic stress syndrome.

The incident that resulted in the grievant's termination occurred at an industry event held on May 20, 2003 called "EMS Night" which the Company sponsored and to which many employees of the Company were invited, as well as Union representatives and representatives from emergency services across the state. David Banelli, the Company's national vice president of labor relations, testified that while attending the EMS Night he observed the grievant strike Ms. Estremera on her buttocks. Mr. Banelli described the incident as "unprofessional, willful misconduct at a Company-sponsored event that violated the Company's discrimination and sexual harassment policy." Mr. Banelli reported what he saw to Robert Zagami, vice president for human resources for the east region, and told him to investigate the matter. Ms. Estremera did not file a complaint with the Company, but submitted a written report at the request of management. Mr. Zagami's investigation led to the grievant's termination for violation of the Company's policy against sexual harassment. The Union grieved the discharge and this arbitration resulted.

Ms. Estremera testified that she and the grievant had a close personal, but non-sexual, relationship that included emotionally supporting each other after the death of their friend, Mr. Hansen. On May 20, 2003, at this social affair, Ms. Estremera was standing within view of various high-level management employees of the Company when the grievant walked by and slapped her on the buttocks. Dave Banelli came over and asked if she would report the matter to Mr. Zagami. When the grievant came by again, Ms. Estremera said to him, "Matt, do you realize you did that right in front of Dave Banelli," and the grievant replied, "Fuck him. Since when are you in bed with management? When did you become a douche?" Whereupon, the grievant again slapped her on the buttocks. Both Ms. Estremera and Lorna Venere told the griev-

ant to knock it off, that he was acting inappropriately. According to Ms. Estremera, the third time that the grievant came by he licked his hand as if to spank her again.

Lorna Venere, a business development representative with the Company, testified that she was talking with Ms. Estremera when she was slapped once by the grievant. She described Ms. Estremera's reaction: "She turned red and looked really embarrassed." She said that Ms. Estremera started to cry after the grievant asked since when are you "fucking management?" According to Ms. Venere, when she told the grievant to "back off," he said, "Fuck management."

The grievant described a heated, blustery relationship between himself and management, particularly with Messrs. Banelli and Zagami. He recalled two incidents during the event between himself and these management representatives that he described as threatening. Early in the party on May 20th, Mr. Zagami had a confrontation with Michael Eosco, president of local 1. Mr. Eosco had not paid for his booth and Mr. Zagami and Mr. Eosco had words. According to the grievant,

> The confrontation escalated. Mr. Eosco had the check in his pocket. He said, "Bob you are being an asshole. Forget it. I don't want your booth."

The grievant recalled that Mr. Zagami told Mr. Eosco, "I'll kick your ass." They were standing nose to nose. The grievant got between the two men and said, "Hey, cut it out guys, you are both acting like assholes." The grievant testified that Mr. Zagami, in turn, threatened to "kick my ass for calling them assholes." The grievant said that later the same evening, Mr. Zagami approached, offered the Union the booth for free, but that Mr. Eosco was no longer interested in being part of the event.

In the second incident, the grievant took a comment by Mr. Banelli to be a threat. The grievant testified that Mr. Banelli motioned him over to talk with him. He said, "You and me are taking a walk around the block tonight." The grievant said, "Excuse me?" Mr. Banelli said, "Get the fuck out of Bridgeport, Connecticut." Mr. Banelli then said he was

just kidding, but the grievant did not think their relationship "supported that kind of joking." The grievant said it bothered him and made him angry. "I was shocked and walked away."

The grievant admitted that he slapped the buttocks of his friend Ms. Estremera that night. He regretted doing it "for the place that we were," although he described their relationship as including two-way playful social pats on the derriere. The grievant denied licking his hand or pretending to slap Ms. Estremera again, and he did not recall calling her a douche.

The grievant, who has been involved in more than ten investigations of sexual harassment in his position as Union representative, acknowledged that his conduct towards Ms. Estremera was unwelcome by her and that it made tension in his relationship with her since. He said he did not take into account the fact that his conduct took place in front of Messrs. Zagami and Banelli.

## POSITIONS OF THE PARTIES

**Employer:**

The Company says the first question is whether the conduct was serious enough to warrant termination, and, if not, was the MOU sufficient basis to terminate the grievant? The Employer argues that the grievant violated its policy against harassment when he twice slapped Ms. Estremera on the buttocks in public at a Company-sponsored industry event, then raised his hand to strike her a third time, but licked his hand instead. The Company contends that the grievant's conduct was serious as his intent was to "vex and annoy management at the expense of Ms. Estremera," who was at a very emotionally sensitive time in her life. According to the Employer, the grievant was terminated for his harassing conduct, and not for his organizing activities.

With respect to the MOU, management contends that it is not subject to the 24-month limit on considering suspensions as prior discipline, but, rather, is a stand-alone document that gave the grievant "a last chance to change his ways." The Employer notes that the Agreement uses permissive language when it says that the Employer "may" main-

tain suspension notices in employment history for 24 months, and suggests that the MOU is a subsequent level of discipline for which an additional six months "retention time period" should apply.

**Union:**

The Union first asserts that the MOU, and all evidence about it, should be excluded from this arbitration because it exceeded the 24-month limit for the life of a suspension under the Contract. The Union contends that the grievant merely engaged in horseplay with a close friend with whom he engaged in similar behavior previously. Such conduct at an industry function does not support the penalty of termination. According to the Union's brief, "[T]he employer is attempting to usurp the inter-personal dynamics of the Levy-Estremera relationship for purposes of punishing Levy's vigorous, concerted and protected union activities."

The Union argues that management terminated the grievant in retaliation for his Union activities, including organization drives at two Employer-owned ambulance companies. According to the Union, management took an adverse action against an employee engaged in protected activities and the Employer's animus played a role in its decision to terminate the grievant. The Employer never demonstrated a legitimate reason for firing the grievant. "Clearly, when Banelli observed Levy pat Estremera on the buttocks, AMR management personnel recognized an opportunity to rid themselves of an able, aggressive and dedicated union representative and organizer... AMR has banned Levy from its ambulance sites nationwide."

The Union asks the arbitrator to overturn the discharge of the grievant and reinstate him to his status as a per-diem employee and retain jurisdiction over reinstatement.

**Relevant Contract Provisions**

Article 15 (Discipline and Discharge) of the Contract provides:

15.1 Discipline and Discharge – The Employer shall neither discipline nor discharge any employee without just cause.
15.2 Procedure – The Employer and the Union recognize the concept of progressive discipline. The Employer shall follow progressive disciplinary procedures before discharging an employee. The Employer and the Union understand and agree that each individual case must be judged on its own merits. Serious or repeated offenses may call for discipline that is commensurate with the offense or total situation and not necessarily based upon the premise of progression.
15.2.1 Warning Notices – To be considered valid, warning notices must be issued within twenty (20) calendar days after the Employer became aware of the occurrence of the misconduct claimed by the Employer in such warning notice. The Employer may maintain such notices on file as part of the employee's employment history as follows:
Verbal Warning – 12 Months
Written Warning – 18 Months
Suspension – 24 Months

15.2.2 Discharge Notices – Discharge must be by proper written notice to the employee affected, with a copy to the Union, within twenty (20) calendar days after the Employer becomes aware of the occurrence of the misconduct(s) claimed as the basis for the discharge.

**The Company's policy against harassment:**

AMR will not tolerate any form of unlawful harassment by or against any of our employees during working time in connection with business or work-related functions. Moreover, AMR will not tolerate harassment that is based on an employee's sex .... Harassment is conduct that has the purpose or effect of unreasonable interfering with an individual's work pe3rformance by creating an intimidating, hostile or offensive working environment. It can include verbal abuse or insults, demeaning jokes or innuendoes, gestures or physical contact and dis-

8

play or circulation of demeaning pictures or materials. It includes conduct by anyone employed by AMR, affiliated with it or doing business with it, including clients.

Sexual harassment is behavior directed at an individual on the basis of their gender, which is not welcome, is offensive, affects morale and as a result, interferes with the work effectiveness of the victim. Sexual harassment in the workplace is unlawful. Unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct will not be tolerated at AMR. In particular, sexual harassment includes any conduct when:

- Submission to such conduct is made either explicitly or implicitly a term or condition or employment; or
- Submission to or rejection of such conduct is used as the basis for employment decisions affecting an individual; or
- Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

...

If a supervisor or manager becomes aware of an incident of ... harassment (whether or not the incident involves a person in particular person's area of responsibility or oversight), that must be reported to the Human Resources Department.

## OPINION

The issues stipulated by the parties concern whether the Employer's decision to terminate the grievant's employment violated Article 15 of the Agreement, and, if so, what remedy is awarded.

Article 15 (Discipline and Discharge) of the Contract provides that the Employer shall neither discipline nor discharge any employee without just cause. It also provides that the Employer shall follow progressive disciplinary procedures before discharging an employee, and that each case is to be judged on its own merits.

The facts are relatively without dispute. While attending an industry promotion function, witnesses observed the grievant slap his close friend and former employee of the Company, Ms. Estremera, on her buttocks. David Banelli was one of the witnesses to the grievant spanking his female friend on the derrière. Ms. Estremera's written report of the incident revealed that the grievant repeated the slap to the buttocks when Ms. Estremera told him that Mr. Banelli had observed his conduct. The grievant also called Ms. Estremera a douche and made disparaging remarks about management at the Company.

Prior to this incident, the grievant, who was working to organize two non-Union ambulances companies owned by the Employer, was summoned to speak with Mr. Banelli, the Company's Director of Labor Relations, and told to leave Bridgeport, Connecticut, where the grievant was trying to organize a non-Union company belonging to the Employer. Although Mr. Banelli then said he was only joking, the grievant took Mr. Banelli's comment to be a threat.

## Discussion

A simple definition of sexual harassment is unwelcome, offensive sexual conduct. The grievant's conduct was both unwelcome, Ms. Estremera said so, and offensive, although minimally so to Ms. Estremera. I agree with the Employer that Mr. Levy was acting provocatively in front of management. No doubt, Dave Banelli was of-

fended by the grievant's conduct, and there were other Company officials in the area who could have seen the grievant slap Ms. Estremera on the buttocks. Although the grievant's conduct was only minimally sexual harassment, it is undisputed really that it was socially inappropriate in such a professional and public setting.

In order to discipline for conduct away from work, the Employer must establish a nexus between the conduct and the Company's interests. In this case, there was strong connection with the Company's sponsorship of the event for promotional purposes and the attendance of many Company officials. As a Company employee and national representative for the Union, the grievant was representing both entities. These factors provide ample nexus for the Company to discipline the grievant for inappropriate conduct at the function.

The crux of this case involves the question of whether or not the penalty of termination was appropriate under the circumstances, which include the MOU and mitigating factors.

The MOU provides for the grievant's termination for another violation of the Company's policy against discrimination and harassment, and the grievant did violate the policy. However, the Union contends that the MOU should not be considered under the terms of the Agreement as it that limits the life of a suspension to two years.

While it is true that the MOU does not have a defined expiration date, it is also true that it is a negotiated discipline that provides for a disciplinary suspension of the grievant of about 17 days. As a member of the bargaining unit, the grievant is entitled to the benefit of the 24-month limitation in the usefulness of a suspension for progressive discipline. By the terms of the Agreement, the Employer may only maintain a notice of a suspension in the employee's employment history for 24 months. Applying that 24-month limitation to the MOU means that it expired April 7, 2003. Therefore, on May 20, 2003, the date of the incident at issue, the grievant's employment history did not include the suspension for purposes of progressive discipline.

Therefore, the MOU expired and is inapplicable to progressive discipline. There remains the question of whether termination was appropriate under the circumstances. Looking at the circumstances of the incident, there are several relevant factors, including the grievant's friendship with Ms. Estremera and the blustery relationship between the grievant and Messrs. Banelli and Zagami (and local Union president Eosco).

The grievant's offense involves the public spanking of a woman. Such an offense may be grounds for termination, and might even rise to the level of a criminal assault and battery. However, in this case, mitigating circumstances require a lesser penalty.

First and foremost, the grievant's relationship with Ms. Estremera was close and personal and they both testified that patting each other playfully on each other's buttocks was normal in their platonic friendship. Therefore, in less public circumstances, the grievant's conduct was neither unwelcome nor offensive to Ms. Estremera. However, she was mortified that the grievant expressed such physical intimacy in front of Mr. Banelli. And she was unhappy that Mr. Banelli wanted her to report the incident to Mr. Zagami. It is significant that Ms. Estremera would never have complained about the grievant's behavior had the Company not pursued the matter. In fact, she stayed out of work the next Monday to avoid the situation, but Mr. Zagami left her two messages on her telephones asking for her to come in and make a statement. Ms. Estremera complied with the Company's request and her statement became the foundation for the grievant's termination.

Another mitigating circumstance was the fact that the incident occurred in the context of the grievant's Union organizing of Company premises in Bridgeport, Connecticut and in Florida. It is also significant that the grievant's inappropriate conduct occurred after the grievant witnessed what he believed to be inappropriate, threatening conduct by high level officers of the Company. I am inclined to agree with the Employer's interpretation of the incident as an effort by the grievant to upset management by flagrantly slapping his female friend on the buttocks right in front of them, but he did this after he received what he perceived to be threats from two different Company officials

at the party. This incident was, thus, steeped in the mercurial labor-management relationship that existed at the time between the grievant and Messrs. Banelli and Zagami.

While none of the mitigating circumstances excuse the grievant's behavior, they require modification of the penalty. Considering the grievant's friendship with Ms. Estremera, there was no just cause to terminate him for doing something that, in their relationship, under less public circumstances was acceptable conduct. At the same time, the grievant's conduct was inappropriate and subject to progressive, corrective discipline since the Company has the right to prohibit public spanking by its employees, particularly at such an important event. Therefore, the penalty will be reduced to a written warning, and the grievant will be reinstated to his position and made whole for lost benefits under the Contract, including back pay, minus interim earnings and/or unemployment compensation, if any. At the Union's request, I will retain jurisdiction over remedy for 60 days.

May 13, 2004                                    _____
                                                Michael W. Stutz