UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AMERICAN MEDICAL RESPONSE OF MASSACHUSETTS, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 04-11736-PBS |
| INTERNATIONAL ASSOCIATION OF EMT's & PARAMEDICS, LOCAL 1, | ) ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
CROSS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and LR, D. Mass. 56.1, plaintiff American Medical Response of Massachusetts, Inc. ("AMR") hereby opposes Defendant's Cross Motion for Summary Judgment dated February 21, 2006 (the "Cross-Motion") on the grounds defendant International Association of EMT's & Paramedics, Local 1 (the "Union") is not entitled to judgment as a matter of law on AMR's Complaint dated August 6, 2004. Rather, it is AMR that is entitled to summary judgment on the Complaint because the Award is in manifest disregard of federal law, namely Title VII, and is in violation of the federal public policy embodied therein.[1]

**I.   UNDISPUTED FACTS**

The Union's Memorandum of Law in Support of Defendant's Cross Motion for Summary Judgment (the "Union's Memorandum") takes substantial and improper liberties with the undisputed factual record before the Court. In the Union's Memorandum at 1, the Union, in

---

[1] For brevity and consistency, AMR will use the same defined terms here as in Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment ("AMR's Memorandum").

defense of the indefensible, attempts to trivialize Levy's sexually harassing behavior by stating that Levy simply "patted" Estremera on the buttocks. That representation grossly mischaracterizes events and is entirely contrary to the Arbitrator's findings in the Award. Rather than finding that Levy "patted" Estremera, the Arbitrator in fact concluded that Levy "slapped" Estremera (Award at 4); "again slapped her" (Award at 4); "licked his hand as if to spank her again" (Award at 5); engaged in the "public spanking of a woman" (Award at 12); and was involved in "flagrantly slapping" Estremera (Award at 12).[2]

The Union's mischaracterization not only is contrary to the evidence, it also is belied by Levy's testimony. As the Arbitrator concluded, Levy "*admitted* that he *slapped* the buttocks of his friend Ms. Estremera that night."[3] See Award at 6 (emphases added). The Union also strives to downplay Levy's outrageous conduct by failing to acknowledge that Levy spanked/slapped Estremera *twice*. See Award at 10 ("repeated the slap to the buttocks. . .").[4] Moreover, Levy "licked his hand as if to spank her again." See Award at 5.

The Union also is reduced to transparent euphemisms to describe Levy's verbal conduct at EMT Night. What the Union passes off as "derogatory" comments about AMR (Union's Memorandum at 2) actually consisted of Levy's profanity-laced statements about Banelli, "Fuck him," and "Fuck management." See Award at 4 and 5.

---

[2]   At the risk of redundancy, the Arbitrator further found that Banelli saw Levy "strike" Estremera (Award at 4) and that Venere testified that Levy "slapped" Estremera (Award at 5). Similarly, the Arbitrator described the event as a "slap" (Award at 10 and 11), stated that Levy "repeated the slap" (Award at 10) and further concluded that Levy engaged in "spanking" and "public spanking" (Award at 10 and 13).

[3]   Levy also conceded that the slap was "unwelcome" and that a year later it still had made his relationship with Estremera "tense." See Award at 6.

[4]   The Union's attempt to misrepresent the event as one where Levy merely "patted" Estremera finds no support in the record. Rather, it was Levy himself who described his general, *private* relationship with Ms. Estremera, not the specific events at issue, as involving "pats." See Award at 6. Similarly, the Arbitrator recognized that there may have been "patting" in different circumstances, but he never ascribed the term to Levy's conduct at EMT Night. See Award at 12. The spanking/slapping the Arbitrator specifically found here was neither done "playfully" nor was it "patting" where Estremera was reduced to tears and mortified. See Award at 5 and 12.

The Union's characterization of Levy's comments about Estremera as merely "uncomplimentary" also is something less than candid. In fact, Levy referred to Estremera to her face as a "douche." See Award at 4 and 10. Levy also asked Estremera, "since when are you in bed with management?" and also "since when are you 'fucking management?'"[5] See Award at 4 and 5. He later returned to Estremera yet a third time and in public "licked his hand as if to spank her again." See Award at 5.

In light of the Union's bald attempt to whitewash Levy's conduct by a purposefully truncated recitation of the facts, its description of AMR's Statement of Facts as both "sensationalized" and "inaccurate" (Objection at 1) rings hollow at best. Levy indisputably stated to Estremera: (i) "Fuck him"; (ii) "Fuck management"; (iii) "since when are you in bed with management?"; (iv) "when did you become a douche?"; and (v) "since when are you 'fucking management?'". See Award at 4 and 5. Those five profane utterances would seem, beyond dispute, to be a "stream of profanities" as AMR appropriately characterized them.

Likewise, the Union is reduced to attempting to split hairs with regard to the Arbitrator's specific conclusion that Levy's "public spanking of a woman" "might even rise to the level of a criminal assault and battery." See Award at 12. The Union's contention that AMR represented that the Arbitrator found Levy's conduct to be criminal (Objection at 2) is simply made up. In paragraph 28 of AMR's Statement of Facts, AMR stated only that the Arbitrator found that Levy's conduct "might even rise to the level of criminal assault and battery. . . ." That is a

---

[5]    Given that Levy already had asked Estremera about her being "in bed with management" (Award at 4), the Union's contention that Levy's further question as to how long she had been "fucking management" should be understood as an adjective rather than a verb (Objection to Plaintiff's Memorandum of Law in Support of It's [sic] Motion for Summary Judgment [the "Objection"] at 2) is at odds with Levy's prior question. AMR's recitation of the facts in Plaintiff's Statement of Undisputed Facts Pursuant to LR, D. Mass. 56.1 ("AMR's Statement of Facts") at paragraph 13 is entirely consistent with Levy's query about Estremera's being in bed with management. In any event, the Union's strained effort to draw a distinction is puzzling. The Union acts as though the interpretation it advocates somehow would be acceptable behavior on Levy's part.

verbatim recounting of the language in the Award at page 12, omitting only the indefinite article "a" before "criminal assault and battery." AMR also correctly described it, in the Arbitrator's view, as "tantamount" to criminal behavior. See AMR's Statement of Facts at ¶26. Notably, the comparison between Levy's conduct and criminal assault and battery is one that originated with the Arbitrator.[6] In light of Levy's undisputed physically and verbally abusive behavior, the facts, as the Arbitrator recounted them in the Award, are sufficiently sensational in their own right.

## II.     ARGUMENT

### A.     **Analysis of the Cross-Motion turns on AMR's manifest disregard and public policy arguments in Plaintiff's Motion for Summary Judgment.**

In Plaintiff's Motion for Summary Judgment dated February 21, 2006 ("AMR's Motion"), AMR demonstrated that, despite the narrow review permitted of arbitral awards, the Award should be vacated because it is in manifest disregard of federal law and violates the public policy embodied in Title VII. See AMR's Memorandum at 3-5. The analysis of both AMR's Motion and the Cross-Motion thus turns only on whether the Award is in manifest disregard of the law and/or in violation of public policy. The Union's lengthy discourse on the general standard of review of arbitral awards, and its discussion of whether the Award finds some basis in the CBA (see Union's Memorandum at 4-11 and 14-17) adds nothing to the issues properly before the Court. An award can draw its essence from the parties' contract and still violate public policy because in undertaking that public policy analysis a court first must presume that the contract calls for an employee's reinstatement and then determine whether such

---

[6]     The Union in the Objection at page 2 further misrepresents AMR's position when the Union states that it "agrees with AMR that Levy engaged in conduct that was 'only minimally sexual harassment' and 'socially inappropriate' conduct. . . ." At no point has AMR ever taken that position, and the Union's argument is knowingly misleading. AMR actually stated that, despite having spanked a female co-worker twice, reduced her to tears, and publicly mortified her, "the *Arbitrator* somehow characterized the sexually harassment as only "minimally offensive. . . ." AMR's Statement of Facts at ¶26 (emphasis added).

a contract term violates public policy.  See Eastern Assoc. Coal Corp. v. United Mine Workers of America, Dist. 17, 531 U.S. 57, 62 (2000) (Supreme Court concluding, "we must assume that the collective-bargaining agreement itself calls for [the employee's] reinstatement" and stating, where "the award is not distinguishable from the contractual agreement," "[w]e must then decide whether a contractual reinstatement requirement would fall within the legal exception that makes unenforceable 'a collective-bargaining agreement that is contrary to public policy'") (quoting W.R. Grace & Co. v. Rubber Workers, 461 U.S. 757, 766 (1983)).  Similarly, an award can be within the arbitrator's authority yet still be in manifest disregard of the law.  See Wonderland Greyhound Park, Inc. v. Autotote Sys., Inc., 274 F.3d 34, 36 (1st Cir. 2001) (First Circuit concluded that arbitrator did not exceed scope of his authority but continued to examine whether award was in manifest disregard of the law).  As a result, AMR for brevity incorporates herein its arguments in AMR's Memorandum and will focus this opposition only on certain arguments in the Union's Memorandum and the Objection that address the manifest disregard and public policy issues.

> B.     **The Award is in manifest disregard of Title VII.**

As AMR established in AMR's Memorandum at pages 5-8, the Award was entered in manifest disregard of Title VII, the controlling federal law.  The entirety of the Union's effort to show that the Award was not so infirm consists only of its reliance on what AMR already has acknowledged is an exceedingly narrow and deferential standard of review.  In response to AMR's manifest disregard arguments, the Union simply repeats that standard of review as though its mere recitation absolves the Union from undertaking any meaningful analysis.  See Objection at 7-9.[7]  In doing so, the Union simply ignores AMR's argument that the Arbitrator, in

---

[7]     The Cross-Motion does not address at all whether the Award was in manifest disregard of controlling law.

utter disregard of Title VII, fabricated two purportedly "mitigating circumstances" (see Award at 13) that Title VII does not recognize.  The Union makes no response to AMR's showing that the Arbitrator's fantastic opinion that "in *less public* circumstances" Levy's conduct would not have been unwelcome or offensive (see Award at 12) (emphasis added) is wholly unfounded in reason or fact.  Where the physical and verbal abuse unquestionably took place in a public setting, the Arbitrator's "reasoning" on this issue is as helpful as an observation that if a rat had wings, it would be a pigeon.

Likewise, in the Objection the Union does not address the failings in the Arbitrator's second manufactured mitigating factor, that being that the abuse occurred in the context of union organizing activity in other states.  See Award at 12-13.  The Union, in apparent recognition of the indefensible character of that justification, is silent on the Arbitrator's "reasoning."  As AMR demonstrated (AMR's Memorandum at 7-8), Title VII does not recognize any affirmative defense of "provocation by a third party" to proven sexual harassment.  Thus, the Arbitrator's conclusion that Levy's perception is "also significant" to the analysis (see Award at 12) is contrary to established law under Title VII.  See AMR's Memorandum at 8 and cases cited there.[8]  In sum, the Arbitrator's explanation for Levy's "flagrantly slapping" Estremera after what Levy "perceived" to be threats is, frankly, just bizarre.

The Award, by its thirteen pages of fact finding and conclusions, provides a broad canvas on which to display both the Arbitrator's knowledge of, and utter disregard of, Title VII by his efforts to fashion loopholes for Levy's behavior that the law simply does not permit.  Unlike in

---

[8]     The Arbitrator's fixation on what Levy "believed" and "perceived" (see Award at 12) is all the more non-sensical because the Arbitrator never even found that Levy's self-described belief or perception of threats was in fact accurate.  The Arbitrator nowhere concluded that Levy's perception bore any relation to reality.  The Arbitrator constructed this mitigating circumstance on a belief that the Arbitrator never determined was warranted, thereby magnifying the lack of both reason and fact for this explanation for Levy's abusive behavior.

Prudential-Bache Sec., Inc. v. Tanner, 72 F.3d 234, 240 (1st Cir. 1995), where the arbitrator did not issue a so-called reasoned award, there is, contrary to the Union's assertion (Union's Memorandum at 8), strong evidence in the record, in addition to the fantastic result, that the Arbitrator acted in manifest disregard of the law.

### C. **The Award violates public policy and thus cannot be enforced.**

The Cross-Motion fails for the separate reason (one which also entitles AMR to judgment in its favor) that the Award reinstating Levy with full benefits violates the public policy found in Title VII. That public policy prohibiting the reinstatement of *repeat* harassers is an explicit, well-defined and dominant one as evidenced by the case law AMR cites in AMR's Memorandum at 10-16. Further, by failing to impose any punishment of consequence on Levy, the Award also contravenes established public policy. See AMR's Memorandum at 16-18. The Union in the Cross-Motion and the Union's Memorandum all but ignores the case law evincing that public policy and has no answer for AMR's showing that the Award, by giving Levy a free pass for his sexual harassment, also violates public policy.

#### 1. **The Union overstates the requirements of the public policy exemption.**

Contrary to the Union's contentions (Union's Memorandum at 12; Objection at 6), the Award reinstating Levy with full benefits and without any meaningful punishment violates the public policy in Title VII. The Union's limited focus on the CBA, AMR's Policy of Non-Discrimination and Non-Harassment, the EEOC Guidelines and the language of Title VII itself (Union's Memorandum at 12 and 18-22; Objection at 5-6) as the only possible sources of an explicit, well-defined and dominant public policy misses the mark. As the Supreme Court made clear in the Eastern Assoc. Coal, 531 U.S. at 63, "courts' authority to invoke the public policy exception is *not* limited solely to instances where the arbitration award itself violates positive

law.  Nevertheless, the public policy exception is narrow and must satisfy the principles set forth in W.R. Grace and Misco." (Emphasis added.)

Similarly, in Boston Med. Ctr. v. Service Employees Int'l Union, Local 285, 260 F.3d 16, 25 (1st Cir. 2001), cert. denied, 534 U.S. 1083 (2002), the First Circuit recognized that, "[e]ven in the absence of a specific law or regulation barring reinstatement in the circumstances of this case, we acknowledge that there might be conduct so egregious that reinstatement might threaten the general public policy promoting the competence of nurses and patients safety."  Recently, the First Circuit reiterated that potential source of public policy when it stated, "[t]o be sure, there is reason to believe that an employer is not invariably required to point to a specific provision of positive law in order to bring a case within the ambit of the public policy exception."  Mercy Hosp., Inc. v. Massachusetts Nurses Assoc., 429 F.3d 338, 345 (1st Cir. 2005), petition for cert. filed, 74 U.S.L.W. 3488 (U.S. Feb. 21, 2006) (No. 05-1080).  In Mercy Hosp., 429 F.3d at 345, the First Circuit observed that in Boston Medical Center it required the employer to show that a reinstatement order subsumed employee conduct "so egregious that resumed employment would offend some deep-rooted public policy."  Here, Levy's conduct as a repeat harasser satisfies that standard, and the cases AMR cites in AMR's Memorandum at pages 10-16 evidence the strong public policy against reinstatement in these circumstances.  Further, as the Supreme Court stated, the public policy must be "ascertained 'by reference to the laws *and legal precedents* and not from general considerations of supposed public interest.'"  W.R. Grace, 461 U.S. at 766, quoting Muschany v. United States, 324 U.S. 49, 66 (1945) (emphasis added).  See also Eastern Assoc. Coal, 531 U.S. at 62 (recognizing public policy is ascertained by "laws and legal precedents. .

."). Thus, the case law on which AMR relies (see AMR's Memorandum at 10-16 and cases cited there) constitutes sufficient legal precedent to establish the controlling public policy.[9]

2. **Public policy compels Levy's termination for repeat harassment.**

Cases such as Newsday, Inc. v. Long Island Typographical Union, No. 915, 915 F.2d 840 (2d Cir. 1990), cert. denied, 499 U.S. 922 (1991), Consolidated Edison of New York, Inc. v. Utility Workers' Union of America, 1996 WL 374143 (S.D. N.Y. July 3, 1996), and City of Brooklyn Ctr. v. Law Enforcement Labor Serv., 635 N.W.2d 236 (Minn. Ct. App. 2001), establish the explicit, well-defined and dominant public policy prohibiting the reinstatement of a repeat harasser. Levy at the time of the arbitration was a two-time harasser, and the public policy expressed in the case law AMR cites (AMR's Memorandum at 10-16) mandates overturning reinstatement awards in favor of repeat wrongdoers.

In the Objection at pages 10-11, the Union fails to understand the proper role that Levy's prior acts of verbal race and national origin-based harassment and the MOU should play in the public policy analysis.[10] In the Award the Arbitrator determined that "the MOU expired and is inapplicable to progressive discipline." See Award at 12. AMR need not establish that the MOU's automatic termination provision was triggered by Levy's admitted spanking of Estremera. Rather, it was the Arbitrator's choice to disregard that prior harassment altogether and to reinstate Levy, by then a repeat harasser, that violated public policy. The Arbitrator, in

---

[9] The Union's observation that neither the CBA nor AMR's Policy of Non-Discrimination and Non-Harassment requires the termination of a sexual harasser (Union's Memorandum at 16, 18 and 19) adds nothing to the analysis here. Neither the CBA nor that policy addresses the specific situation of a repeat harasser that is before the Court.

[10] As an initial matter, the Union's characterization of that earlier harassment, for which Levy received a seventeen-calendar day suspension (see Award at 3), as "an incident nearly five years old. . ." (Objection at 10) is intentionally misleading. As the Union well knows, Levy committed that harassment just over two years before the events at issue here. The MOU was dated April 7, 2001, only approximately twenty-five and a half months prior to the sexual harassment. That AMR's Motion and the Cross-Motion come almost five years after Levy committed that race and national origin-based harassment is of no import to the relevant factual chronology before the Court.

issuing the Award, clearly never evaluated the public policy implications of disregarding entirely that earlier harassment.  That prior harassment was an event that occurred and cannot be ignored under the public policy analysis, even if it does not automatically trip the MOU's termination clause.  Thus, properly understood, AMR does not ask the Court to relitigate the Arbitrator's legal conclusion with regard to the MOU.  Rather, AMR contends that the Award, to the extent it chose to ignore a prior act of harassment and to reinstate Levy, by then a two-time harasser, violated public policy as set forth in Newsday and its progeny.

### III.    CONCLUSION.

For the reasons set forth above and in AMR's Memorandum, the Court should grant AMR summary judgment in its favor and against the Union on the Complaint, deny the Union's Cross-Motion, vacate the Award and grant AMR such other relief as this Court deems just and appropriate.

Respectfully submitted,

AMERICAN MEDICAL RESPONSE
OF MASSACHUSETTS, INC.,

By its attorneys,


/s/ Kevin P. Sweeney
Paul J. Murphy, BBO No. 363490
Kevin P. Sweeney, BBO No. 548761
Menard, Murphy & Walsh LLP
60 State Street, 34th Floor
Boston, MA 02109
(617) 832-2500

Dated:  March 21, 2006